SMITH COUNTY REGIONAL
PLANNING COMMISSION

v.

HIWASSEE VILLAGE MOBILE
HOME PARK, LLC.

Supreme Court of Tennessee,
at Nashville.

Oct. 7, 2009 Session.

Jan. 22, 2010.

R.H. Pursell and Edward Hadley, Nashville, Tennessee, for the appellant, Hiwassee Village Mobile Home Park, LLC.

Jack O. Bellar and J. Branden Bellar, Carthage, Tennessee, for the appellee, Smith County Regional Planning Commission.

**OPINION**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., and GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

A county planning commission sued to enjoin the operation of a mobile home park that did not comply with the county's Private Act. At trial, the successor-in-interest stipulated to the mobile home park's noncompliance but claimed the park was grandfathered as a prior legal commercial use pursuant to Tennessee Code Annotated section 13–7–208(b)(1), arguing that a previous owner had established the park before the Private Act took effect. The trial court granted injunctive relief to the planning commission, finding both that the park was not in operation prior to the Private Act, and that the park was later abandoned. The Court of Appeals determined that the mobile home park was a residential use to which section 13–7–208(b)(1) did not apply but nonetheless affirmed the trial court's findings concerning abandonment. We hold that this mobile home park is a commercial use within the scope of section 13–7–208(b)(1). We further hold that the evidence does not preponderate against the trial court's finding that the mobile home park was not grandfathered because it was not yet in operation when the Private Act took effect. This finding was sufficient to warrant the injunction, and we need not reach the issue of abandonment. Accordingly, we affirm the judgment of the trial court.

*FACTUAL AND PROCEDURAL HISTORY*

On April 12, 1975, the Smith County Quarterly Court approved a Mobile Home Resolution regulating mobile home parks and individual mobile homes in Smith County ("1975 Resolution"). Section 3.1 of the 1975 Resolution required a permit from the county building inspector or health inspector to establish or maintain a

mobile home park.[1] Section 2.1 also required every mobile home within the county to have a valid state license or mobile home permit. The enforcement history of the 1975 Resolution is not contained in the record.

On May 30, 1997, Hal and Lynn Dickerson conveyed 9.9 acres of land along Hiwassee Road in Smith County to Ricky D. Sanders, Robert D. Sanders, Jr., and Jonathan E. Sanders as tenants in common.[2] On November 10, 1997, Robert Jr. and Jonathan quitclaimed their interests to Ricky, who testified that he acquired this property for the purpose of mobile home rentals. According to Ricky's testimony, at the time he acquired sole interest in the property, he checked with staff members of the Smith County Regional Planning Commission ("Planning Commission"), who told Ricky that Smith County had no regulations governing mobile home park development.[3]

At the January 26, 1998 meeting of the Planning Commission, which Ricky attended, two events relevant to this case occurred. First, staff members confirmed what they had told Ricky about the lack of existing regulations and opined that any future regulations would not be enforced retroactively. Second, staff members circulated a draft of a proposed private act to regulate mobile home parks ("Private Act"). Section 3 of the Private Act makes it "unlawful for any person to place or maintain three (3) or more mobile homes for living or sleeping purposes on any premises or tract of land in Smith County" outside specified municipalities without a permit. On February 23, 1998, the Planning Commission formally recommended adoption of the Private Act by the Smith County Board of Commissioners. On March 9, 1998, the Board of Commissioners approved adoption of the Private Act. The Private Act was then forwarded to the state legislature for formal action.

Following the January meeting with the Planning Commission, and notwithstanding the pendency of the Private Act, Ricky testified that he had "checked with everybody and [he] thought [he] was in the clear." After obtaining a draft blueprint for the mobile home park, Ricky began by installing septic tanks and obtaining approval of the septic system. Ricky ultimately received several Certificates of Completion of Subsurface Sewage Disposal System from the Department of Environment and Conservation. March 2, 1998 is the last date any such certificate was signed by the Department's representative.[4] Ricky testified that the tanks were installed before the certificates issued.[5]

---

1. Section 1.2 defined a "mobile home park" as "any plot of ground within Smith County on which two (2) or more mobile homes, occupied for dwelling or sleeping purposes, are located and wherein the spaces are located and prepared for rental purposes."

2. Ricky, Robert Jr., and Jonathan are brothers.

3. No explanation has ever been offered concerning why Ricky was not told about the 1975 Resolution.

4. Separate from what is written on the signature line, the certificates contained a notation for a "Riverwood System # " and the date

12–7–98. Riverwood is another name for the mobile home park that Ricky established on Hiwassee Road. The date notation is not self-explanatory, and, on cross-examination, Ricky denied that December 7, 1998 was the date of completion of the sewage disposal system.

5. Ricky ran field lines to and installed some septic tanks on an adjacent 3.63–acre piece of property that he also owned. After selling the property containing the mobile home park, Ricky retained ownership of the adjacent 3.63–acre parcel until August 2006. Interim owners had purchased the park but not the adjacent parcel. Indeed, one such owner installed an extra septic tank on the adjacent parcel.

Ricky testified that he next obtained the permits for installing electricity at the park. All forms labeled "Electrical Permit and Application for Inspection" were dated April 1998. Each permit listed a $19 state inspection fee and a $3 county permit fee. Ricky further testified that he purchased ten water taps in 1997 and had those taps installed over a period of time in 1998. He conceded that he could not precisely recall dates. A document from the South Side Utility District indicated the opening of water tap accounts for ten lots: three on November 11, 1997; three on May 15, 1998; and one each on June 15, 1998, July 15, 1998, October 19, 1998, and November 19, 1998. Below the listing of lots and dates, the document states, "These dates reflect when accounts were entered into computer. They would have been 1 to 2 months later than when tap was actually purchased."

Ricky testified that he began renting lots by April 1, 1998, and rented six lots "[r]ight off the get-go." As documented by a Settlement Sheet dated April 16, 1998, Ricky purchased ten new mobile homes for a total of $98,630.[6] Ricky testified that delivery of the new mobile homes began "right close" to that date. He also purchased four used mobile homes at some point thereafter. Ricky testified that a tenant first moved into a mobile home around May 30, 1998. However, Ricky's testimony was not corroborated by any documents that established when he actually began collecting rents or how much rent he collected. Ricky testified that he continuously maintained the property as a mobile home park from the time he began renting lots.

The Tennessee Legislature passed the Private Act as 1998 Private Chapter Number 152 on April 20, 1998. Then–Governor Don Sundquist signed the Private Act on May 1, 1998. Section 10 stated that the Private Act "shall have no effect unless it is approved by a two-thirds (2/3) vote of the County Legislative Body of Smith County." The Board of Commissioners approved the Private Act, and it took effect on May 11, 1998. As noted, section 3 of the Private Act makes it "unlawful for any person to place or maintain three (3) or more mobile homes for living or sleeping purposes on any premises or tract of land in Smith County" outside specified municipalities without a permit.

On June 15, 1999, Ricky sold the mobile home park and the mobile homes to John Blackwell of Clayton Homes. Blackwell and his wife filed for Chapter 11 bankruptcy on January 4, 2001. Although the substitute trustee published a notice in the *Carthage Courier* of a foreclosure sale scheduled for February 8, 2002, this sale never took place. The Blackwells' bankruptcy case was converted to Chapter 7 on February 21, 2002. The Blackwells obtained a discharge from the bankruptcy court on June 10, 2002. The bankruptcy trustee filed a notice of abandonment[7] of the Hiwassee Road property on August 28, 2002.

Once the Blackwells filed bankruptcy, the conditions at the park deteriorated, leading county representatives to believe it might be abandoned. Jody Pritchett, Smith County's land use administrator, testified that, when he first toured the park in January 2001, the access road "was

6. The Settlement Sheet reflects that Ricky made a $10,000 down payment on March 24, 1998. He then tendered the remaining balance by cashier's check on April 16.

7. Pursuant to 11 U.S.C. § 554(a) (2004), "[a]fter notice and a hearing, the [bankruptcy] trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."

kind of washed out" with sewage runoff. He testified that some of the mobile homes "were not, at that time, being occupied and you could tell that they were going downhill pretty fast." Some trailers "had been burned out." When asked whether he had seen "any administrative control out there on the premises," Pritchett answered, "Not that I could tell, no." In subsequent visits on February 8 and March 23, 2001, Pritchett concluded, "[t]hings just kept getting worse." Pritchett testified that he received complaints from park residents regarding individuals moving trailers into the park that they did not own and failing to pay rent. On cross-examination, Pritchett conceded that photographs taken during his March 2001 visit did not show any of the problems cited in his testimony, and that he lacked personal knowledge of whether any of the park's residents were actually paying rent.

Two members of the Planning Commission, Billy Piper and Glenn Pettross, each testified about the condition of the park based on tours of the property during the first quarter of 2002. Piper testified that he saw sewage runoff above the ground and windows broken out of most of the trailers. He also denied seeing "any signs of control" on the premises. When Pettross was asked whether he had seen "any evidence ... that [the property] was being run as a mobile home park," he answered, "It wasn't being taken care of at all. It didn't look like it. It was just in bad shape."

The Planning Commission filed the complaint on February 6, 2002, alleging that defendants Ricky Sanders, John Sanders Blackwell, and Christy Lynne Blackwell were operating a mobile home park on property along Hiwassee Road in violation of the Private Act.

Bruce Scott obtained the property from the Blackwells via a quitclaim deed on June 11, 2004. Scott testified that he also paid $10,000 apiece to a bank and a group of attorneys to satisfy their respective mortgage interests in the property. By warranty deed dated May 31, 2006, Scott later conveyed the Hiwassee Road property and thirteen mobile homes then located on the property to Joseph Claybon of Hiwassee Village Mobile Home Park, LLC ("Hiwassee LLC").[8] Mr. Claybon began efforts to clean up the property and bring it into compliance with then-applicable regulations. He also applied for required permits. Kevin Rush, the Smith County planning director, testified that no previous owner of the park ever applied for a mobile home permit from the inception of the park until the end of 2006 or beginning of 2007.

The trial court granted leave to amend the complaint on September 26, 2005 to add Bruce Scott, then-owner of the property, as a defendant and again on August 14, 2006 to add Hiwassee LLC after it had obtained the property from Scott. Ricky Sanders and the Blackwells were dismissed from the litigation prior to the filing of motions for summary judgment. The Planning Commission obtained injunctive relief against Scott on summary judgment.[9]

On July 12, 2007, the trial court conducted a bench trial. Hiwassee LLC stipulated that the mobile home park was not then in compliance with the Private Act. Nonetheless, Hiwassee LLC contended that it was not subject to injunction be-

8. In a separate transaction consummated in August 2006, Claybon purchased from Ricky Sanders the 3.63–acre parcel where some of the septic tanks were installed.

9. As reflected in the trial court's July 10, 2007 summary judgment order, Scott did not oppose the motion, having already conveyed the property to Hiwassee LLC.

cause Ricky Sanders had legally established the mobile home park on the property prior to the enactment of the Private Act, thus entitling the property to continuing protection as a prior conforming commercial use under Tennessee Code Annotated § 13–7–208(b)(1) (Supp.2009)[10] ("grandfather clause"). Hiwassee LLC further contended that the Planning Commission could not prove that the property subsequently lost the protection of the grandfather clause through abandonment of its use as a mobile home park.[11]

At the beginning of trial, Hiwassee LLC filed a motion in limine to exclude the 1975 Resolution and any evidence that prior mobile home park owners violated it. Hiwassee LLC argued that Smith County first alleged a violation of the 1975 Resolution in a brief filed shortly before trial. *See* Tenn. R. Civ. P. 8.05(1) ("[t]he substance of any ordinance or regulation relied upon for claim or defense shall be stated in a separate count or paragraph [of a pleading] and the ordinance or regulation shall be clearly identified"). In response Smith County explained that, while its lawsuit only alleged a violation of the 1998 Private Act, admission of the 1975 Resolution would show that prior owners of the park were on notice of the requirement to apply for various permits. Smith County further argued that, while the failure to comply with those requirements might be inadmissible to show that the mobile home park was illegal from the beginning, the noncompliance would be relevant to whether the park was "in operation" when the

Private Act took effect. The trial court agreed with Smith County, denied the motion in limine, but stated it would consider the 1975 Resolution "only . . . as it relates to whether or not the park was in operation prior to the adoption, the effective date, of the 1998 Private Act."

At the conclusion of testimony, the trial court made findings of fact.[12] The trial court found that the grandfather clause did not protect the mobile home park because the park was not in operation when the Private Act took effect. Instead, the trial court found that Ricky Sanders's efforts prior to the Private Act's effective date amounted to mere preparation and intent. Focusing on the money that Ricky expended, the trial court noted the $286 cost for the electrical permits and also the purchase of mobile homes for rent. However, the trial court also noted the absence of proof about the cost of the water taps and sewage permits and the failure to corroborate Ricky's testimony about the lot rentals with proof of those rentals or the monies received from them. Furthermore, without "consider[ing] the existence or the non-existence of the 1975 County Resolution," the trial court found that the failure of any owner of the mobile home park to apply for a permit until 2006 was a "critical fact."

Even assuming for the sake of argument that the grandfather clause initially protected the property, the trial court found in addition that the use as a mobile home park was abandoned for the period begin-

---

**10.** Prior to the 2004 amendments, this provision was codified as subsection (b), but the language was the same. We cite the statute as it is presently located within the Code.

**11.** At trial, the parties disputed whether Sanders or subsequent owners had forfeited the protection of the grandfather clause because of impermissible expansion of the use of the property. We have not recited the facts rela-

tive to the alleged expansion because the trial court expressly declined to make a finding on that issue and because the parties did not raise it on appeal.

**12.** These findings included statements made on the record at the conclusion of trial and the contents of a written order filed August 16, 2007.

ning one year prior to the filing of the lawsuit in February 2002 until Bruce Scott became the owner in June 2004. The trial court specifically cited Pritchett's testimony about the "early stages of abandonment or disuse or lack of maintenance" that Pritchett observed when visiting the property in early 2001. The trial court found that those who lived on the property during the period of abandonment were "little more than trespassers" who "got the benefit of a free place to live" but did not "pay[ ] or contribut[e] to the commerce of the home or the mobile home park." Based on these findings concerning the lack of operation before the effective date of the Private Act and the subsequent abandonment, the trial court granted the Planning Commission "injunctive relief to remove, destroy, construct, build or alter the mobile home park in any way necessary to bring [it] into compliance with the Private Act."

Hiwassee LLC appealed, arguing that the trial court had erred in finding that the park was not "in operation" before the Private Act took effect and that the use of the property as a mobile home park was abandoned. Relying on grounds not presented to the trial court, the Court of Appeals held that the grandfather clause did not apply to a "residential" use such as the mobile home park. The Court of Appeals further concluded that the evidence preponderated against the trial court's finding that Ricky Sanders only made preparations, rather than beginning full operation of the park, prior to the enactment of the Private Act. Accordingly, the Court of Appeals held that Ricky had established a vested right to continue a pre-existing use. Nonetheless, the Court of Appeals affirmed the trial court's decision to issue an injunction because the evidence did not preponderate against the finding of abandonment.

We granted Hiwassee LLC's application for permission to appeal. We rephrase the questions presented as follows: (1) Does the grandfather clause apply to mobile home parks? (2) Was the park on Hiwassee Road in operation when the Private Act took effect, such that the grandfather clause protected the park's operation after that date? (3) Did the park on Hiwassee Road subsequently lose the protection of the grandfather clause through an abandonment of use? We answer the first question in the affirmative and the second question in the negative, and, therefore, we need not reach the third question. Because the trial court properly granted injunctive relief to the Planning Commission, we affirm, albeit on different grounds, the judgment of the Court of Appeals.

## STANDARD OF REVIEW

█ In a civil action where the trial court sits without a jury, "review of findings of fact by the trial court ... shall be de novo upon the record ..., accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R.App. P. 13(d); *see Kirkpatrick v. O'Neal,* 197 S.W.3d 674, 678 (Tenn.2006). We review *de novo* conclusions of law, including questions of statutory interpretation, with no presumption that the lower courts' conclusions are correct. *Kirkpatrick,* 197 S.W.3d at 678; *Wallace v. State,* 121 S.W.3d 652, 656 (Tenn.2003).

## ANALYSIS

### Application of Tennessee Code Annotated § 13–7–208

█ Counties obtain their power to enact zoning ordinances and otherwise regulate the use of land by delegation from the state. *Edwards v. Allen,* 216 S.W.3d 278, 284 (Tenn.2007); *Cherokee Country Club, Inc. v. City of Knoxville,* 152 S.W.3d

466, 471 (Tenn.2004). Tennessee Code Annotated section 13–7–101(a)(1) (1999 & Supp.2009) empowers county legislative bodies to regulate the uses of land. *See Edwards*, 216 S.W.3d at 284. The state delegates the zoning power to local legislative bodies because that power "is viewed as essentially a legislative exercise of the government's police power." *Family Golf of Nashville, Inc. v. Metro. Gov't*, 964 S.W.2d 254, 258 (Tenn.Ct.App.1997).

■ Hiwassee LLC contends that, although the mobile home park does not comply with the requirements of the 1998 Private Act, Tennessee Code Annotated section 13–7–208 protects its operation of the park as a prior conforming commercial use.[13] In relevant part, the statute reads:

(b)(1) In the event that a zoning change occurs in any land area where such land area was not previously covered by any zoning restrictions of any governmental agency of this state or its political subdivisions, or where such land area is covered by zoning restrictions of a governmental agency of this state or its political subdivisions, and such zoning restrictions differ from zoning restrictions imposed after the zoning change, then any industrial, commercial or business establishment in operation, permitted to operate under zoning regulations or exceptions thereto prior to the zoning change shall be allowed to continue in operation and be permitted; provided, that no change in the use of the land is undertaken by such industry or business.

*Id.* § 13–7–208(b)(1). Our Court of Appeals has classified this provision as a "grandfather clause," which it describes as follows:

A grandfather clause is defined as "an exception to a restriction that allows all those already doing something to continue doing it, even if they would be stopped by the new restriction." *Black's Law Dictionary* 629 (5th ed.1979). A grandfather clause exception in a statute must be construed strictly against the party who seeks to come within the exception. *Teague v. Campbell County*, 920 S.W.2d 219, 221 (Tenn.Ct.App.1995), *perm. app. denied* (Tenn.1996).

*Lamar Tennessee, LLC v. City of Hendersonville*, 171 S.W.3d 831, 835–36 (Tenn.Ct.App.2005) (quoting *Coe v. City of Sevierville*, 21 S.W.3d 237, 243 (Tenn.Ct. App.2000)). Since " '[p]roperty is usually already in use when it is first zoned, and so it is inevitable that ideal zoning theory will clash with the existing use of particular pieces of property,' " this grandfather clause " 'avoid[s] the legal problems that would attend a local government's efforts to force a private property owner to discontinue an otherwise permissible use of property.' " *Custom Land Dev., Inc. v. Town of Coopertown*, 168 S.W.3d 764, 772 n. 4 (Tenn.Ct.App.2004) (quoting *Lafferty v. City of Winchester*, 46 S.W.3d 752, 758 (Tenn.Ct.App.2000)).

### 1. Applicability to County Regulations

■ Although not raised by the parties, we begin our analysis by noting that, while

---

**13.** The trial court correctly found that, if the mobile home park were a prior conforming commercial use, the right to continue that use after the effective date of the Private Act would run with the land and benefit Hiwassee LLC as a subsequent owner. *See Board of Mayor & Aldermen v. Glover*, Fayette Equity No. 1, 1989 WL 65634, at *2–*3 (Tenn.Ct. App. June 20, 1989); *Hickerson v. Flannery*, 42 Tenn.App. 329, 302 S.W.2d 508, 514 (1957); *accord Budget Inn of Daphne, Inc. v. City of Daphne*, 789 So.2d 154, 159 (Ala. 2000); *Henry v. Cherokee County*, 290 Ga.App. 355, 659 S.E.2d 393, 396 (2008). That finding is not disputed on appeal.

section 13–7–208(b)(1) is codified in the part of the statute pertaining to municipal zoning, the plain language of the statute protects establishments from subsequent changes in zoning restrictions enacted by "any governmental agency of this state or its political subdivisions," including counties. Chapter 7 of Title 13 is divided into four parts, including Part 1 ("County Zoning"), Tennessee Code Annotated sections 13–7–101 to –115, –117 to –119, and Part 2 ("Municipal Zoning"), *id.* sections 13–7–201 to –212. Both of these parts contain a section on the enforcement of zoning ordinances and remedies for violations thereof. *See id.* §§ 13–7–111, –208. Part 2's enforcement and remedies provision includes a grandfather clause, but Part 1's corresponding provision does not. *Id.* Based on the statutory scheme, some opinions from the Court of Appeals have reasoned that the grandfather clause protects prior conforming uses only from subsequent ordinances enacted by municipalities. *See Fields v. White,* No. 88–250–II, 1989 WL 5456, at *2 (Tenn.Ct.App. Jan.27, 1989) (rejecting argument premised on the statute's "broad language" and holding that the grandfather clause "has no application where the zoning change is not a result of municipal zoning"); *accord Riggs v. Burson,* No. 03A01–90506–CV–00193, 1995 WL 635748, at *3 (Tenn.Ct.App. Oct.31, 1995), *rev'd on other grounds,* 941 S.W.2d 44 (Tenn.1997); *see also Browning–Ferris Indus. of Tenn., Inc. v. Bd. of Comm'rs,* 806 S.W.2d 181, 189 (Tenn.Ct.App.1990) (concluding that the "General Assembly dealt separately and differently with counties and cities insofar as enabling legislation pertaining to zoning is concerned").

By contrast, the Court of Appeals reached a different result in *Chadwell v. Knox County,* 980 S.W.2d 378 (Tenn.Ct. App.1998), *perm. app. denied* (Tenn. Oct. 19, 1998). Despite the implications of the statutory scheme, the court held that the statutory text would still control:

> Since [the grandfather clause] is found under the title, chapter and part dealing with municipalities, it would appear . . . that [the grandfather clause] has no application to counties. A closer scrutiny, however reveals otherwise. We are not at liberty to overlook the clear, unambiguous language of any statute and must interpret it in accordance with well-established rules of construction.

*Id.* at 382. The court ultimately concluded that the grandfather clause "applies not only to municipalities but to any governmental agency of the state or its political subdivisions. Clearly a county is a political subdivision of the State of Tennessee and falls within the contemplation of the legislation."[14] *Id.*

We agree with the interpretation of the grandfather clause set forth in *Chadwell.* The primary purpose of statutory interpretation is "to ascertain and give effect to the intent and purpose of the legislature." *Walker v. Sunrise Pontiac–GMC Truck, Inc.,* 249 S.W.3d 301, 309 (Tenn.2008). Whenever possible, we discern legislative intent " 'from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language.' " *Lipscomb v. Doe,* 32 S.W.3d 840, 844 (Tenn.2000) (quoting *Hawks v. City of Westmoreland,* 960

---

**14.** In other instances, the Court of Appeals extended grandfather protection to commercial establishments against subsequent county zoning regulations without referencing the statutory scheme. *E.g., Rutherford v. Murray,* No. E2003–01333–COA–R3–CV, 2004 WL 1870066, at *7–*8 (Tenn.Ct.App. Aug.20, 2004); *Nat'l Auto/Truck Stops, Inc. v. Williamson County,* No. M2000–02456–COA–R3–CV, 2001 WL 434860, at *1 (Tenn.Ct.App. Apr.30, 2001).

S.W.2d 10, 16 (Tenn.1997)). Therefore, when we are confronted with clear, unambiguous language, "we must apply its plain meaning in its normal and accepted use, without a forced interpretation that would limit or expand the statute's application." *Eastman Chem. Co. v. Johnson*, 151 S.W.3d 503, 507 (Tenn.2004).

Here, the grandfather clause's reference to "a[ny] governmental agency of this state or its political subdivisions" clearly and unambiguously includes counties. In a variety of contexts, the Tennessee Code Annotated confirms that "political subdivisions" include both counties and municipalities. *See, e.g.,* Tenn.Code. Ann. §§ 4–18–102(4) (2005) (False Claims Act defines "political subdivision" as meaning "any city, town, municipality, [or] county, including any county having a metropolitan form of government"); 8–48–111 (2002) (applying emergency interim succession provisions "to officers of political subdivisions (including, but not limited to, cities ... and counties")); 62–26–218(a) (2009) (exempting licensed private investigators from requirement to obtain permit or post bond "in any municipality, county or other political subdivision of this state"). The inference that the grandfather clause excludes counties because of its placement within the statutory scheme would amount to a forcibly narrow interpretation of the natural and ordinary meaning of "political subdivisions." Instead, we apply the plain meaning of the term, adopting the reasoning of *Chadwell* and rejecting contrary interpretations set forth in other decisions of the Court of Appeals.

### 2. Applicability to Mobile Home Parks

█ Having determined that the grandfather clause applies to changes in county zoning regulations, we move to the question of whether a mobile home park is the kind of establishment amenable to grandfather clause protection. The Court of Appeals held that Hiwassee LLC was not subject to the grandfather clause because section 13–7–208(b)(1) applies only to "any industrial, commercial or business establishment" and does not protect residential establishments. The Court of Appeals classified the mobile home park as a residential establishment because the park was used for human habitation. On brief and at oral argument, the parties acknowledged they had agreed that Hiwassee LLC operated the mobile home park as a commercial establishment. Before this Court, both parties continue to argue that the Court of Appeals erred in classifying Hiwassee LLC's mobile home park as a residential use. On the facts of this case we agree.

Trailers and mobile homes have undergone a great deal of change since they first appeared in our culture. Erwin S. Barbre, Annotation, *Validity and Application of Zoning Regulations Relating to Mobile Home or Trailer Parks*, 42 A.L.R.3d 598, 602 (1972) (hereinafter "Barbre"). In the 1920s, the original "mobile home" was often a small vehicle used by tourists or itinerant workers as a place of temporary residence. *Id.*; 2 Kenneth H. Young, *Anderson's American Law of Zoning* § 14.01, at 703 (4th ed.1996) (hereinafter "Young"). The units were constructed to be placed on wheels and transported over roadways. Allan D. Wallis, *Wheel Estate* 31–39 (1991) (hereinafter "Wallis"); Barbre, 42 A.L.R.3d at 602. Early mobile home or trailer parks were intended to provide only temporary parking spaces for traveling persons. Wallis, at 39. The clearly transient nature of both the trailer and its occupants rendered both suspect in the communities through which they passed. Young, § 14.01, at 704; Barbre, 42 A.L.R.3d at 602. Thus, early zoning ordinances attempting to regulate these parks often prohibited them entirely from

residential areas. *See, e.g., Jensen's, Inc. v. Town of Plainville*, 146 Conn. 311, 150 A.2d 297, 299 (1959); *City of Raleigh v. Morand*, 247 N.C. 363, 100 S.E.2d 870, 874 (1957). Park owners clearly operated commercial ventures, renting out spaces to park, perhaps electrical hookups, and communal restroom, bath, park, or other spaces for short stays. Wallis, at 40–43.

Beginning in the 1950s, as society itself became more transient and the cost of conventional housing rose, mobile homes became a more popular housing alternative. Jay M. Zitter, Annotation, *Validity of Zoning or Building Regulations Restricting Mobile Homes or Trailers to Established Mobile Home or Trailer Parks*, 17 A.L.R.4th 106, 109 (1982). Towns and cities began to see requests to place individual trailers onto individual lots. *See, e.g., Robinson Twp. v. Knoll*, 410 Mich. 293, 302 N.W.2d 146, 154 (1981); *Morin v. Zoning Bd. of Review*, 102 R.I. 457, 232 A.2d 393, 395 (1967). They also began to see requests to operate more permanent mobile home parks, where either an individual would park his personally-owned vehicle permanently or where the owner of the park would provide "permanent" vehicles for long-term rental. *See* Wallis, at 192–95; James F. Vernon, Note, *Mobilehomes: Present Regulations and Needed Reforms*, 27 Stan. L.Rev. 159, 165–67 (1974). Often, in both those situations, wheels would be removed from the chassis of the vehicle and a more permanent platform, often including a porch or other amenities, would be constructed onto the vehicle. *See* James Milton Brown & Molly A. Sellman, *Manufactured Housing: The Invalidity of the "Mobility" Standard*, 19 Urb. Law. 367, 367–68 (1987) (hereinafter "Brown & Sellman") (citing Arthur D. Bernhardt, *Building Tomorrow: The Mobile/Manufactured Housing Industry* 291–98 (1980)). Because mobile homes continued to engender suspicion and fear on the part of residents, cities and counties have struggled to determine their classification for zoning and taxation purposes. Young, § 14.01, at 705–07, § 14.03, at 714–20, & § 14.13, at 754–56. As governments became more urbanized and adopted more stringent zoning regulations, the applicability of nonconforming use provisions became more important to owners of trailer parks which often had been opened before the existence of zoning restrictions. *See, e.g., Slaven v. City of Buford*, 257 Ga. 100, 355 S.E.2d 663, 663–64 (1987); *City of Crowley v. Prejean*, 173 So.2d 832, 837 (La.Ct.App.1965).

Commentators, and most courts until very recently, have agreed that "[a] mobile home court is a commercial venture." Young, § 14.01, at 706; *see Midgarden v. City of Grand Forks*, 79 N.D. 18, 54 N.W.2d 659, 662 (1952) (describing health and safety concerns specifically associated with the congregation of trailers into trailer parks, such as "undue concentration of population, lack of proper facilities for removal of rubbish, disposal of waste and sewage"); 3 Patricia E. Salkin, *American Law of Zoning* § 20:5 (5th ed. Westlaw 2009 update) (discussing the exclusion of mobile home parks from residential districts because the parks limit the growth potential of the land, present public health hazards, and pose challenges in supplying municipal services). Focusing on the communal nature and continued assumption of itinerancy of mobile homes and their tenants, courts well into the 1980s and 1990s distinguished mobile home parks from more traditional types of housing and even from the placement of individual mobile homes on individual lots. For example, in *Overstreet v. Zoning Hearing Board*, the Pennsylvania Commonwealth court reasoned:

> we note that both as a legal and a practical matter, individual mobilehomes

and mobilehome parks are two different types of legitimate housing uses. Thus, as in this case, the fact that an ordinance allows mobilehomes, like other detached, single-family dwellings, to be placed on individual lots in residential districts does not affect our analysis of the municipality's regulation of mobilehome parks.... [A] mobile home park is not simply a conglomeration of mobile homes, but rather a planned community involving social, recreational and commercial activities. Therefore, the device of permitting mobile homes on individual lots will not substitute for the responsibility of providing for mobile home parks.

152 Pa.Cmwlth. 90, 618 A.2d 1108, 1113 (1992) (internal quotations omitted).

■■■ This Court's only consideration of the classification of mobile home parks as either residential or commercial arose in our decision more than twenty years ago in *Clouse v. Cook*,[15] No. 87–68–I, 1988 WL 34834 (Tenn. Apr.18, 1988). In that case, the Clouses owned and operated a ten-acre, seventy-unit trailer court inside the city limits of Franklin. When the city annexed the property in 1969, the city's zoning ordinances prohibited the operation of a trailer court but allowed an existing use to continue without expansion for twenty-five years after a zoning change rendered that use nonconforming. However, Tennessee Code Annotated section 13–7–208 permitted nonconforming commercial uses not only to continue in perpetuity, but also to expand on the property through the destruction and reconstruction of the facilities. In July 1985, the Clouses demolished two adjacent units, added to the foundation of one such unit, and constructed a new unit twice as large as one of the demolished units. On July 31, 1985, the city's building inspector issued a permit for a "storage room" which could not be used for a dwelling. The city's zoning board denied the Clouses a permit to rent the new unit, a decision which the chancery court and Court of Appeals affirmed. Although the Clouses claimed the protection of the grandfather clause, the city and

---

**15.** Our reference to *Clouse* requires us to address the weight that we assign to precedents that we have marked as "Not Designated for Publication." Although the Court of Appeals opined that *Clouse* had no precedential value beyond the parties in that case, the Court of Appeals incorrectly stated that we had also marked *Clouse* as "not for citation pursuant to Tenn. S.Ct. R. 4." *Smith County Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC*, No. M2007–02048–COA–R3–CV, 2008 WL 3343001, at *6 n. 6 (Tenn.Ct.App. Aug.11, 2008). We did not, in fact, mark *Clouse* as "Not for Citation." Similarly, at the time that we decided *Clouse*, we did not prohibit the citation of decisions marked "Not Designated for Publication." To the contrary, the version of Rule 4 then in effect stated, "No opinion so designated [as not for publication] shall be cited in any court *unless* a copy thereof shall be furnished to the court and to adversary counsel." Tenn. S.Ct. R. 4, § 5 (1988). The rule plainly contemplated that parties would and could cite opinions marked "Not Designated for Publication," so long as those parties provided a copy of the opinion to the court and to opposing counsel.

We continued to allow the citation of opinions marked "Not Designated for Publication" after the November 1999 amendment to Rule 4. In relevant part, the amended rule reads: "An unpublished opinion shall be considered *controlling authority between the parties to the case* when relevant.... Unless designated 'Not for Citation,' '[Denied, Concurring in Results Only]' or '[Denied, Not for Publication]' ..., unpublished opinions for all other purposes shall be considered persuasive authority." Tenn. S.Ct. R. 4(H)(1) (1999). Our *Clouse* opinion bears none of the designations that would prevent us from considering it as persuasive authority. Therefore, based upon Rule 4 in its past and present forms, we may consider *Clouse*, an opinion marked "Not Designated for Publication," as persuasive authority in deciding this case, insofar as it is similar to the facts before us.

its board members maintained that the clause did not apply because, while the "plaintiffs [were] engaged in a business venture in renting the units in the trailer court, . . . the renters use[d] the units as 'residences' and . . . such use negates an industrial, commercial or business classification." *Id.* at *2. We reversed the Court of Appeals, reasoning as follows:

> Plaintiffs rent 70 units on a weekly basis in an area designed and used as a trailer court or trailer park. No rational person would have referred to the units that plaintiffs demolished as "single family residences," or "residences" of any character. This record is silent with respect to the number of units that are occupied by transients, or longer term tenants, but the units in the [Clouses' trailer court] were referred to by the building inspector, and others, as "mobile homes". . . . The very nature of a trailer court or trailer park containing house trailers and mobile homes give[s] rise to the assumption of transient occupancy as distinguished from residential occupancy.
>
> The bottom line is that the "occupants" of the units are more realistically classified as customers of a trailer court operation than occupants of "residences." Defendants admit, and it is beyond question, that plaintiffs are en-

gaged in a "business" in the operation of the trailer park. In addition, plaintiffs have been permitted to operate the trailer court from the date of annexation to July 1985 as a nonconforming use, entitled to the benefit of [the city's zoning ordinance]. If the "use" was residential at the date of annexation, the City could have and should have, under its ordinances, terminated the operation immediately.

*Id.* Because the demolition and new construction did not change the use classification of the land, we held that the Clouses were protected by the grandfather clause.

■ More recent changes in the construction of mobile or modular homes [16] and in the permanency of subdivision-like developments that allow the placement of such homes have rendered some of the concerns articulated in these earlier cases obsolete as applied to newer developments. *See* Brown & Sellman, 19 Urb. Law. at 385. In the instant case, however, we believe that Hiwassee LLC's park, as originally contemplated, was similar in nature to the trailer park determined in *Clouse* to be "commercial" rather than "residential" in nature.

The parcel in question in this case comprised 9.9 acres of property. At trial Hiwassee LLC introduced a drawing of the

---

**16.** Today homes intended for permanent use can be manufactured offsite in modules. Except for factory-manufactured mobile homes constructed as a single self-contained unit and mounted on a single chassis, which further meet other size and design criteria set forth in the Uniform Standards Code for Manufactured Homes Act, manufactured dwellings are protected from zoning prohibitions based strictly on the fact of their manufacture. Tenn.Code Ann. § 13–24–201 (Supp.2009) (citing subsections of § 68–126–202); *see Tenn. Manufactured Hous. Ass'n v. Metro. Gov't,* 798 S.W.2d 254, 256–59 (Tenn.Ct.App. 1990) (holding that the statute protected a double-wide manufactured home). Else-

where, our state code separately regulates "modular building units," which are "manufactured off-site and transported to the point of use for installation or erection . . . as a finished building." Tenn.Code Ann. § 68–126–303(7) (Supp.2009); *see Williams v. Fox,* 219 S.W.3d 319, 323 (Tenn.2007) (distinguishing modular homes from mobile homes in the context of determining the scope of a restrictive covenant). Our classification of the mobile home park in this case is not intended to include or address the classification of these other forms of manufactured housing, whether as individual units or in collective groups.

mobile home park as Ricky Sanders originally envisioned it. That drawing proposed a total of sixty-six spaces for trailers to be located. He himself purchased ten new trailers and four used trailers for use on certain of the lots. Ricky testified that, although he never completed the entire project, he operated the mobile home park as a business and that, when he sold the property to John Blackwell in 1999, he also sold the trailers. Ricky also rented six utility-equipped lots on which individuals presumably placed their own vehicles. Testimony from subsequent owners, and from city officials, confirms that residency in the mobile homes was transient and that, at times, no one lived in the trailers and they began to deteriorate.

Additionally, the Planning Commission never contested that the park had been operated as a commercial establishment, thus entitling it to the application of the grandfather clause. In its brief to this Court, the Planning Commission concedes it has waived the right to argue otherwise.

Based on Ricky Sanders's stated intention to create a trailer park with sixty-six lots available for rent, his statement that he intended to operate the park as a business, and the parties' concession that the operation on this particular parcel of property was commercial in nature, we conclude that this park was protected by the grandfather clause in this case.[17]

### 3. Applicability Based on Operational Status

The park's eligibility for grandfather clause protection based on its commercial status does not end the inquiry, for the clause sets forth other preconditions in order to protect a previously legal use rendered nonconforming by a new or amended zoning regulation. Specifically, the clause requires that the establishment be "in operation" prior to the change in zoning regulations. The trial court found that Ricky Sanders's efforts prior to the enactment of the Private Act only manifested intent and preparation for a mobile home park but that Hiwassee LLC did not carry its burden of proof to establish that the mobile home park was actually in operation. The Court of Appeals concluded the opposite: that the evidence preponderated against the trial court's finding and that Ricky had taken substantial enough steps to establish a pre-existing use of the property as a mobile home park prior to the passage of the Private Act. As the party seeking the benefit of the grandfather clause, Hiwassee LLC bears the burden of showing that the mobile home park qualified for the grandfather clause's protection based on its actual operational status at the time the law changed.[18] *Out-*

---

17. Our basis for resolution of this issue pretermits our need to consider the efficacy of the Court of Appeals' reliance on its prior decisions classifying individual structures inhabited by more than one family as residential uses to determine how to classify the mobile home park in this case. *See City of Red Bank v. Phillips*, No. E2006–02267–COA–R3–CV, 2007 WL 4460223, at *5 (Tenn.Ct. App. Dec.20, 2007) (house on single lot configured for three separate dwelling units); *Bramblett v. Coffee County Planning Comm'n*, No. M2005–01517–COA–R3–CV, 2007 WL 187894, at *9 (Tenn.Ct.App. Jan.24, 2007) (duplex on single twenty foot by twenty foot lot). We offer no opinion on the proper classification of an individual three-family dwelling or duplex, as those properties are not at issue here.

18. In addition to the establishment being "in operation" before the change in zoning regulations, the grandfather clause also requires that the establishment be "permitted to operate under zoning regulations or exceptions thereto." *Rives v. City of Clarksville*, 618 S.W.2d 502, 505 (Tenn.Ct.App.1981). This means actually permitted by the regulations, not permitted merely through lax enforcement. *See id.* at 506 (nonenforcement of zoning regulations at the beginning of a particular use does not give the landowner per-

door W. of Tenn., Inc. v. City of Johnson City, 39 S.W.3d 131, 135 (Tenn.Ct.App. 2000); Lamar Adver. of Tenn., Inc. v. City of Knoxville, 905 S.W.2d 175, 176 (Tenn. Ct.App.1995).

In addition to an ongoing business, our courts have held that the grandfather clause protects property owners who "ha[ve] taken substantial steps in the construction of [the establishment] prior to the change in the Zoning Regulations" or where " 'substantial liabilities are incurred relating directly to construction.' " Rutherford v. Murray, No. E2003–01333–COA–R3–CV, 2004 WL 1870066, at *8 (Tenn.Ct. App. Aug.20, 2004) (quoting State ex rel. SCA Chem. Waste Servs., Inc. v. Konigsberg, 636 S.W.2d 430, 437 (Tenn.1982)); accord Heath Twp. v. Sall, 442 Mich. 434, 502 N.W.2d 627, 630 (1993); Ellington Constr. Corp. v. Zoning Bd. of Appeals, 77 N.Y.2d 114, 564 N.Y.S.2d 1001, 566 N.E.2d 128, 132 (1990). As our Court of Appeals has noted:

> The basic problem in the instant case is one that has been faced by many courts over the past years and is well stated as follows: "Land development and building construction generally stretches out over a period of time. The question is at what point will a court recognize that the developer is entitled to protection from a change in zoning that would bar a use permitted when development or construction was commenced." Gackler Land Co. v. Yankee Springs Twp., [427

Mich. 562] 398 N.W.2d 393, 403 (Mich. 198[6] ) (Levin, J., dissenting). Our state statute requires that there be an "industrial, commercial or business establishment in operation" in order to continue prior use.

Dickson County v. Jennette, No. M1999–00054–COA–R3–CV, 2000 WL 1121550, at *8 (Tenn.Ct.App. Aug.9, 2000); see also Rutherford, 2004 WL 1870066, at *7–*8. These "substantial steps" which may be sufficient include evidence that, prior to the change in zoning regulations, the landowner devoted the property to the then-permitted use and that other parties, including the regulatory authority, recognized the landowner as actually using the property in the manner claimed. Rutherford, 2004 WL 1870066, at *8. Specifically, in Rutherford the grandfather clause protected an auto repair shop because, prior to the change in zoning regulations, the property owner obtained a building permit, began to pour footers and stack blocks for the garage, and started to operate the business. Id. at *7. Furthermore, the owner introduced a letter from the county zoning administrator acknowledging that the business was established before the zoning amendment and verified by the planning director. Id. at *4.

 In contrast, mere preparation to use the property, such as site plan approval and the issuance of a business license, does not qualify as a prior noncon-

mission to operate within the meaning of the grandfather clause).

Our review of the 1975 Resolution leads us to conclude that the mobile home park never complied with its permit requirements either. Nonetheless, the Planning Commission in this case refused to plead or attempt to prove that the mobile home park was not "permitted to operate" because of its failure to apply for the permits required by the 1975 Resolution. As the trial court noted, the 1975 Resolution could have been introduced on dispositive

questions: "did [Hiwassee LLC], as a successor in title, fail to comply with the 1975 Zoning Resolution, and if not, does this case end there[?]" However, counsel for the Planning Commission expressly disclaimed reliance on such a theory and declined the trial court's offer of a continuance to allow an opportunity to amend the complaint. Thus, the Planning Commission has waived the right to address that claim in this Court. In re J.C.D., 254 S.W.3d 432, 443 (Tenn.Ct.App. 2007).

forming use. *Custom Land Dev.,* 168 S.W.3d at 775–76; *see Buffalo Crushed Stone, Inc. v. Town of Cheektowaga,* 13 N.Y.3d 88, 885 N.Y.S.2d 8, 913 N.E.2d 394, 400 (2009) ("a mere contemplation of purpose, lacking supportive evidence of undertakings to effectuate such intentions, will not suffice"); *H.R.D.E., Inc. v. Zoning Officer,* 189 W.Va. 283, 430 S.E.2d 341, 346 (1993) (no vested right in nonconforming use from "[m]ere contemplated use or preparation or preliminary negotiations"). The grandfather clause is "designed to protect ongoing business operations, not to extend the time allowed to develop a nonconforming business." *Custom Land Dev.,* 168 S.W.3d at 775.

Decisions from the Court of Appeals have elaborated on the kinds of preparations that fall short of being "in operation" and, therefore, do not warrant grandfather clause protection. In *Dickson County,* the court held that the property owner had only made preparations to operate a quarry before the enactment of a zoning resolution that prohibited quarrying without a special exception. 2000 WL 1121550, at *8. The property owners had twice blasted rock on the property for the purpose of constructing a road and had made a single sale that the court described as an "incidental commercial transaction." *Id.* at *7. Also, the owners had entered an option-to-lease agreement which prevented them from operating or allowing the operation of a quarrying business. Similarly, in *Campbell v. Bedford County Regional Planning Commission,* the Court of Appeals denied grandfather clause protection to a body shop because the proof at trial "did not establish that the plaintiffs had an ongoing auto repair business" before the defendant commission zoned the property as an agricultural and forestry district. No. M2003–00025–COA–R3–CV, 2004 WL 626724, at *3 (Tenn.Ct.App. Mar.29, 2004). Despite evidence of preparation and intent, such as the clearing of land, pouring of concrete, roof construction, and installation of siding, the plaintiffs did not produce evidence of their customer base, business operation, or invoices for repair work. *Id.* at *1, *3.

██ We decide whether the landowner has done enough to give rise to a prior nonconforming use by reviewing the facts of each case, as do many other jurisdictions. *E.g., Baxter v. City of Preston,* 115 Idaho 607, 768 P.2d 1340, 1342 (1989); *Legrand v. Ewbank,* 284 S.W.3d 142, 146 (Ky.Ct.App.2008); *Seven Islands Land Co. v. Me. Land Use Regulation Comm'n,* 450 A.2d 475, 481 (Me.1982); *Storage Masters–Chesterfield, L.L.C. v. City of Chesterfield,* 27 S.W.3d 862, 866 (Mo.Ct.App.2000); *Clackamas County v. Holmes,* 265 Or. 193, 508 P.2d 190, 192 (1973).

After reviewing the record before us in this case, we conclude that the evidence does not preponderate against the trial court's finding that Ricky Sanders's efforts only represented preparation and intent, which are insufficient to establish that the mobile home park was "in operation" before the change in zoning regulations. Although Ricky testified that he rented out lots prior to the enactment of the Private Act, he acknowledged that the first tenant did not move onto the property until "right close" to May 30, 1998. The trial court correctly noted that Hiwassee LLC did not introduce evidence to corroborate Ricky's earlier lot rentals or to show the amount of monies, if any, that he received from tenants before that date.

The septic system and water tap certificates do not reflect how much Ricky paid for them. Ricky paid only $22 in state and local fees for each of thirteen electrical permits, totaling an insubstantial expenditure of $286.

██ While Ricky spent $98,630 to purchase ten mobile homes and began moving

those homes onto the property shortly before the Private Act took effect, he did not apply for the necessary permits required for each mobile home. The 1975 Resolution required that Ricky obtain permits before establishing a mobile home park or using an individual mobile home. The trial court admitted the 1975 Resolution for the limited purpose of determining whether the mobile home park was "in operation." Even considering the 1975 Resolution only for that purpose, Ricky's failure to apply timely for the relevant permits also acts to negate Hiwassee LLC's contention that the park was "in operation." Without those permits, Hiwassee LLC also has not shown that Ricky was devoting the property to use as a mobile home park or putting others, including Smith County, on notice of his mobile home park operation.[19] *See Rutherford*, 2004 WL 1870066, at \*7–\*8.

The trial court found that Hiwassee LLC failed to carry its burden of showing that the mobile home park was "in operation" prior to the enactment of the Private Act. Although our analysis is different, we cannot say that the evidence preponderates against this finding. Accordingly, we hold that the mobile home park is not entitled to the protection of the "grandfather clause," Tenn.Code Ann. section 13–7–208(b)(1), because it was not "in operation" prior to the change in zoning regulations that rendered the mobile home park a nonconforming use. Having concluded that the grandfather clause never protected the mobile home park, we need not reach the issue of whether the park use was subsequently abandoned.[20]

## CONCLUSION

We hold that, although the mobile home park owned by Hiwassee LLC is an "industrial, commercial or business establishment," it was not "in operation" prior to

19. Because we have determined that the mobile home park was not "in operation" as of the effective date of the Private Act, it is not necessary to consider whether the pending legislation doctrine applies to allow us to choose an earlier effective date against which to analyze Ricky Sanders's efforts to open the park. Under this doctrine, a "permit need not be issued if pending at the time of application is an amendment to a zoning ordinance that would prohibit the use of land for which the permit is sought." *Harding Academy v. Metro. Gov't*, 222 S.W.3d 359, 364 (Tenn.2007). In *Harding Academy*, we recognized that courts disagree as to when an ordinance is "pending," but held that the ordinance in that case was not pending because the zoning commission had not yet made a recommendation to the city council. *Id.* at 366.

Here, the record is clear that, on January 26, 1998, at the same Planning Commission meeting where Ricky was told there were no existing regulations to prevent his business venture, commission staff circulated a proposed private act to regulate mobile home parks. On February 23 the Planning Commission formally recommended approval of

that act to the County Commission. The County Commission approved the act on March 9. Thus, as of one of those dates, the Private Act was "pending," such that Smith County could have refused to issue Ricky a permit if he had applied for one. *See id.* at 364, 366. Courts in other jurisdictions have denied protection to nonconforming uses where the landowner made efforts after obtaining actual or constructive knowledge of a pending restrictive ordinance, holding that such construction was not in good faith. *See Town of Cross Plains v. Kitt's "Field of Dreams" Korner, Inc.*, 775 N.W.2d 283, 295 (Wis.Ct.App.2009) (collecting cases from eight other jurisdictions).

20. In its abandonment findings, the trial court concluded that Tennessee Code Annotated section 13–7–208(g), which sets a 30-month period for computing the abandonment of a nonconforming use, did not apply retroactively to uses preceding its enactment in 2004. The Court of Appeals acknowledged this conclusion in a footnote. Because we need not reach the abandonment issue to resolve this appeal, we leave for another day the question of whether section 13–7–208(g) applies retroactively.

the enactment of Smith County's 1998 Private Act, nor had its owner taken substantial enough steps in good faith prior to passage of the Private Act to claim protection under the grandfather clause as a prior conforming commercial use. Therefore, the Planning Commission is entitled to injunctive relief to terminate the operation of the park. We affirm the judgment of the trial court and Court of Appeals. The case is remanded to the trial court for enforcement. Costs of this appeal are assessed against the Appellant, Hiwassee Village Mobile Home Park, LLC, and its surety, for which execution may issue, if necessary.