IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 1, 2021 Session

## CATHY MCKEEHAN v. KATIE PRICE

**Appeal from the Chancery Court for Loudon County**
No. 12770    Frank V. Williams, III, Chancellor

No. E2021-00453-COA-R3-CV

This appeal concerns an issue of whether a modular home violates a subdivision's restrictive covenants. Katie Price ("Price") wanted to place a modular home on her property in Fort Loudon Estates subdivision. Cathy McKeehan ("McKeehan"), a long-time resident of Fort Loudon Estates, sued Price in the Chancery Court for Loudon County ("the Trial Court"). McKeehan alleged that Price's modular home violated a subdivision restriction against temporary structures. After a bench trial, the Trial Court found in favor of Price. McKeehan appeals. The evidence does not preponderate against the Trial Court's finding that Price's home is not a temporary structure. We hold, as did the Trial Court, that Price's modular home is not prohibited by the subdivision's restrictions. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and KRISTI M. DAVIS, JJ., joined.

Donald Capparella and Patrick Riley, Nashville, Tennessee; and Kimberlee A. Waterhouse and Taylor E. Jenkins-Dowd, Lenoir City, Tennessee, for the appellant, Cathy McKeehan.

Brian T. Mansfield, Sevierville, Tennessee, for the appellee, Katie Price.

# OPINION

## Background

In May 2020, Price bought Lot 25 in Fort Loudon Estates in Loudon County. She soon thereafter obtained a permit to place a "double-wide" mobile home on her lot. In July 2020, McKeehan, a long-time resident of Fort Loudon Estates, filed her Petition for Enforcement of Covenants and Restrictions and for Temporary Restraining Order and Permanent Injunction against Price in the Trial Court. Fort Loudon Estates' covenants and restrictions were recorded in 1959. In her petition, McKeehan relied on Item Four of the covenants and restrictions for Fort Loudon Estates, which provides: "4. Temporary Structures: No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding shall be used on any lot at any time as a residence either temporarily or permanently."

Acting on McKeehan's petition, the Trial Court entered a temporary restraining order against Price, enjoining her "from placing a mobile home, trailer, or other temporary structure on Lot 25 located in Fort Loudoun Estates #1 pending further hearing of this cause." Price then filed an answer, stating in part: "The Defendant requests this petition … be dismissed as evidence has been provided to the Court, and the Plaintiff's attorney, that a doublewide, nor any type of mobile home, will not be being placed on said property by the Defendant nor any other person acting on the Defendant's behalf." In October 2020, Price filed a motion objecting to injunctive relief and seeking to dissolve the restraining order. In her motion, Price stated that she had originally bought a double-wide mobile home but had since cancelled that purchase. Price opted for a modular home instead, which was "constructed, approved and regulated under the *Tennessee Modular Building Act of 1985*, TCA §68-126-301, et seq." Price asserted that her new modular home was distinct from a mobile home and passed muster under the restrictive covenants. The Trial Court subsequently entered an order finding that the temporary injunction should issue and remain in force through a final hearing on McKeehan's petition. McKeehan was to post an injunction bond of $5,000.

In January 2021, a trial on the merits was held before the Trial Court. James Anthony (Tony) Buhl ("Buhl"), a salesperson for Oakwood Homes—a branch under Clayton Homes—testified first. Buhl sold Price a double-wide mobile home, but Price received a full refund on it when she opted for a modular home instead. Price had not yet paid for the modular home. If Buhl completed the sale, he would earn a commission of around 20% of the profit. Appalachia Homes, another subset of Clayton Homes, manufactured the home. The home would be delivered first to Buhl at his facility. The

home then would be transported to Price's lot in two pieces using a tractor and an escort. Asked if a chassis were involved, Buhl stated it was a "wood frame." The two separate pieces of the home would be assembled on-site. Buhl testified that if Price had kept the double-wide mobile home, it too would have been transported in two sections. Asked if the frame would be removed from the modular home, Buhl stated: "We do two types of modular homes, yes. We can do an off-frame mod or an on-frame mod by the stipulations set in 2006. They have both. They're both modular homes." Price's home was an "on-frame mod." Buhl stated that the modular home's dimensions were different from those of the double-wide mobile home: "One is 32 wide compared to 28 wide. And one is 76 and one is 68 foot." Buhl testified there were mobile homes with the same exterior façade as the modular home. Price's home had already been built; such homes are built to order. Asked if Price's home could be moved once it was placed on her lot, Buhl testified:

> Q. Mr. Buhl, if Ms. Price were to sell her lot and wish to move her home somewhere else, is it possible to move the home that she's intending to purchase from one lot and place it on a new lot?
> A. She would not be able to move it, no. I -- can the house be moved? Yes. I mean --
> Q. Can it be moved --
> A. - once the axles and the -- okay, I'm sorry. Once the axles and the -- it's on a permanent foundation once we get it there. So we would have to take it off of the permanent foundation to move the house.
> Q. Okay. It would be moved in the same manner that it's moved to your lot after it's constructed?
> A. Yes, ma'am.
> Q. Would the axles be reattached at that point and then pulled on the tractor that you mentioned before to relocate the home?
> A. After we removed the permanent foundation, yes, ma'am.
> Q. Okay. And what is this permanent foundation?
> A. There's several options for permanent foundations. If you have -- we've got less than ten minutes to describe them, but I do block foundations. We can crane them onto the permanent foundations. I can set the permanent foundation around the house. I can attach the permanent foundation to the house. There's all different types of permanent foundations, yes, and we've not decided on which particular permanent foundation we're doing on this one. Does that help?
> Q. Yes. Thank you, Mr. Buhl.
> A. Okay.
> Q. Is it possible to also put a permanent foundation on a double-wide mobile home?
> A. Yes, ma'am.

Q. Mr. Buhl, is it fair to say that just as with double-wides, this two-piece structure that Ms. Price is wishing to place on her property is likewise mobile?
A. Likewise mobile?
Q. Uh-huh.
A. Yes, ma'am.

On cross-examination, Buhl testified that the home Price was going to purchase from him was a modular home, not a mobile home. Buhl was shown documents to the effect that this was a "regulated and constructed modular home." Buhl stated that a modular home does not have a title. A modular home also is designed to be permanently affixed to a foundation. Buhl testified that a modular home was not designed to be easily transportable to different sites like a single-wide trailer or a mobile home. Buhl stated:

Q. Okay. And some don't even have a remaining chassis, but some do -- and I mean that I'm talking about the metal framing. I believe you told me earlier that on this particular home you keep the metal framing in there to maintain the integrity and strength of the home; is that correct?
A. It's my personal belief leaving the metal frame on the home makes the home more structurally sound but some prefer to take the frame off of the house.
Q. Right.
A. And it's just -- it's a preference to either one.

Buhl stated that modular homes are regulated and dealt with separately from mobile homes in terms of construction, design, and qualifications with authorities. The modular home has a serial number, as well. On redirect-examination, Buhl testified:

Q. Mr. Buhl, you had mentioned a serial number. Are all of these units given a serial number?
A. Yes, ma'am.
Q. Okay. You also testified that this home is not readily removable, can't be readily removed. Is it accurate that you've testified that --
A. It takes a professional to move it, yes. It's not easily moved, no.
Q. But it's moved just as easily as a double-wide?
A. Depending on the foundation.
Q. So both the double-wide and the current structure both could have a permanent foundation, correct?
A. Yes, ma'am.
Q. Both have a frame?
A. Yes, ma'am.

-4-

Q. And both can have the wheels and axles reattached?

A. Yes, ma'am.

Q. And both can be disassembled and transported in the same manner; is that accurate?

A. Yes, ma'am.

Q. So is it safe to say that the home that Ms. Price intends to place on her lot is just as movable and removable as a double-wide mobile home?

A. That, like I said before, it all depends on what foundation we put on it.

Q. If they have the same foundation -- with the same foundation, are they just as movable?

A. Yes, ma'am.

Q. Okay. You mentioned that you always recommend keeping the steel frame on these homes because --

A. Yes, ma'am.

Q. It gives extra support?

A. Yes, ma'am.

Q. Is that because they're more -- made of inferior materials to a site-built home?

A. No. They all have 2x4 instructions, eight 2x8 trusses, 16 on the center. So I mean as far as site-built homes -- basic plumbing, same shingles, same siding, same structure -- it's just you're putting it on a metal frame underneath with I-beams that if you put a site-built home out there you put I-frames down first before you put the trusses, it's always going to make it more structurally sound.

Q. So is the --

A. That's my opinion, my professional opinion.

Q. Yeah, of course. So is the frame beneficial then to help transport the home --

A. It's the --

Q. -- in keeping it secure?

A. A little of both. I mean, you can put these houses on a trailer and move them, but the frame itself is strong enough to withstand that movement.

Q. Okay. And is it accurate to say that you were not familiar one way or the other whether this home complies with the Act?

A. What Act are you speaking of?

Q. The Tennessee Modular Building Act. Are you capable of testifying as to whether this structure complies with that Act?

A. Since I didn't build the house and I didn't set the standards, no, ma'am, I cannot. But I can just tell you when I order it from a manufacturer that builds them, they should meet those standards because that's the way they build them.

-5-

Q. But you personally cannot say?
A. I'm not an expert on that, no, ma'am.

On recross-examination, Buhl stated that with the right person, "any house" in the subdivision could be transported on frames and axles whether they were "stick-built or not."

McKeehan testified next. McKeehan had lived in Fort Loudon Estates since 1985. McKeehan testified that the fair market value of her home was around $576,000. McKeehan believed Price's modular home would affect the values of all of the homes in the subdivision. McKeehan stated:

> It's -- all of the subdivision right now are what they call stick-built homes, homes that have been up-kept, and some of them are in the process of being extensively remodeled. And I just think that this type of home would not -- would not be beneficial to the neighborhood.

Before McKeehan sued Price, a letter was sent to Price discussing the subdivision's covenants and restrictions. McKeehan stated there were no other mobile homes or modular homes in Fort Loudon Estates.

On cross-examination, McKeehan stated she had seen the plans and specifications for Price's new home. McKeehan considered it to be a double-wide trailer. McKeehan was pressed on why she held this view and whether the restrictive covenants forbade the modular home at issue:

> Q. Okay. Are you aware that this particular home that Ms. Price is purchasing is a Tennessee modular home?
> A. No.
> Q. You're not aware of that?
> A. No.
> Q. Do you have any evidence that it is not a modular home?
> A. Your definition of modular home and my definition of modular home are two different things.
> Q. So let me reask the question: On your definition of a modular home, do you have any reason to believe that this one is not a modular home?
> A. No. It's not a modular home as far as I am concerned.
> Q. What do you say a modular home is?
> A. A modular home is brought in and put in position by cranes and is usually more than one story. It's usually two stories or several units, not two units.
> Q. And where do you get that information from?

A. Well, I get that information from the reading that I've done in the research that I've done on modular homes and manufactured homes.

Q. What is your criticism of this particular structure? You said you've seen the plans. What is wrong with the house that you think is the problem?

A. I think it's a double-wide and therefore I think some of the products used to construct it are inferior.

Q. How do you know that?

A. Just by looking at the plans, by looking at the virtual tour of the home.

Q. Okay. So you just think it's an inferior constructed home; that's your concern?

A. Yes, sir.

Q. Have you read the covenants and restrictions that are applicable to the subdivision?

A. Yes, sir.

Q. You're familiar with them?

A. Yes, sir.

Q. Do you know what provisions are in there that discuss the quality of the construction of the homes?

A. Yes. I don't have that in front of me, but yes, I did read the quality of the homes.

Q. Okay. Well, so are you aware of any provision, for example, in the covenants and restrictions that say the construction has to be of a certain type of materials and certain quality?

A. There is a restriction on the size and that it can't have a veneer on it and -- let's see.

Q. Well, let me see if this sounds familiar to you. It says that "No dwelling shall be permitted on any lot which shall have a ground floor area of the main structure, exclusive of one story open porches and garages, of less than 900 square feet." Does that sound right?

A. Yes, sir.

Q. So you can build a 900-square-foot mini-house in your subdivision; is that correct?

A. It says of less than one-story dwelling of 900 square feet, which in 1959 was a good size house.

Q. Okay. That's still the rule, right?

A. Yes.

Q. And then it says you can't have any brick siding, but it has no restriction on the type of materials at all that can be used for the construction, does it?

A. It says "inferior materials."

Q. You can't have inferior materials. Do you know what that means?

A. It just means that you can't -- something that is not -- how can I explain it

to you?  You couldn't build a house and not put drywall in it.  You couldn't build a house and not put plumbing in it.  You couldn't build a house that doesn't have a good basic structure to it or one that doesn't have an adequate foundation --

Q. Okay.

A. -- or one that doesn't have adequate electricity.

Q. Okay.

A. That's inferior quality, to me.

Q. Fair enough.  But you could have an exposed foundation and you could make it out of any siding other than brick veneer.  You could have a flat roof --

A. It does not say that.  It doesn't say that you can have an exposed foundation.

Q. It doesn't say you can't, does it?

A. But it doesn't say you can.

Q. Okay.  But these are restrictions.  Does it say you can't?

A. No, sir, it doesn't.

***

Q. Is there a prohibition against having a hundred-foot antenna or five antennas in the front yard of a house in your neighborhood?

A. Not to my knowledge.

Q. How about junk cars or a tractor-trailer out front?

A. I don't think so, no.

Q. How about a flat roof?

A. I don't think so, no.

Q. How about a fence, a chain link fence or a blockade fence all the way around the perimeter?

A. No.

Q. How about chickens or pigs?

A. We don't have chickens or pigs.

Q. They're not prohibited, are they?

A. No.

Q. Do you agree that the homeowners have the ability to amend the covenants and restrictions?

A. Yes, sir.

Q. And that's never been done?

A. Because we've never felt the need.

Q. But could have if you wanted to?

A. Yes, sir, we could have if we wanted to.

-8-

Price moved for dismissal. The Trial Court found in favor of Price on all issues. In February 2021, the Trial Court entered its Order and Decree. The Trial Court stated:

> This matter was heard on the merits before the Honorable Frank [V.] Williams, III, Chancellor, via Zoom hearing on January 14, 2021, whereupon the Court was provided various exhibits introduced by the parties, heard the testimony of the Petitioner, Cathy McKeehan, and the witness, Tony Buhl, as a representative of Oakwood Homes, considered the arguments of counsel, the applicable statutory and case law and the record as a whole. The Petitioner presented the testimony of Ms. McKeehan, Mr. Buhl and the submission of various documents in evidence and then rested. Thereupon, the Respondent, through counsel, moved for a dismissal of the case, which the Court granted, finding that the applicable Covenants and Restrictions for Fort Loudon Estates subdivision of record in Book 66, Page 235 of the Register of Deeds Office for Loudon County, Tennessee — particularly the provisions against "Temporary Structures" — do not prohibit the Respondent from erecting on her lot in the subdivision as a residence her modular home as identified in the documents submitted by Respondent and as testified to by the witness, Tony Buhl. A…[1]
>
> ORDERED, ADJUDGED AND DECREED as follows:
>
> 1. The Complaint of the Petitioner, Cathy McKeehan, is hereby ***dismissed***.
>
> 2. All Orders previously entered in this cause granting or extending injunctive relief to the Petitioner against the Respondent are *dissolved* and of no further effect. The Respondent may place, erect and retain on her lot in Fort Loudon Estates, the modular home she is purchasing.
>
> 3. The attached transcript of the Court's findings and rulings is incorporated herein and made a part of this Order.
>
> 4. Any claim the Respondent, Katie Price, may have upon the Petitioner's surety injunction bond is *reserved*.
>
> 5. The clerk's court costs are taxed against the Petitioner, Cathy McKeehan.

(Footnote added).

Price thereafter filed her Motion for Recovery Under Injunction Bond, stating in part: "[T]he Respondent requests that she be awarded a judgment against the Principal and

---

[1] At this point in the Trial Court's order, a line was crossed out and the following words were handwritten and initialed by the Chancellor: "The findings of fact and conclusions of law are a part of the transcript and not the Order or Judgment." Neither party raises as an issue the sufficiency of the Trial Court's findings.

Surety under the Injunction Bond in the amount of $5,000.00, jointly and severally, for her costs and damages or pursuant to TCA§ 29-23-104 for the wrongful restraint and injunction against her." For her part, McKeehan filed a motion to alter, amend, or set aside the Trial Court's judgment. In March 2021, the Trial Court heard the outstanding motions. At this hearing, Price testified to her damages. In April 2021, the Trial Court entered an order denying McKeehan's motion to alter, amend, or set aside its judgment. The Trial Court also entered an order on the injunction bond, stating in part: "[T]he Court finds that the Respondent's claim for attorney's fees and additional transportation costs is not sustained, but the claims for loss of use and additional lot rent are sustained, which amounts exceed the $5,000.00 limit of the bond." The Trial Court ordered judgment in favor of Price in the amount of $5,000. McKeehan timely appealed to this Court.

## Discussion

Although not stated exactly as such, McKeehan raises the following issues on appeal: 1) whether the Trial Court erred in interpreting the Fort Loudon Estates covenants and restrictions as not prohibiting the modular home Price wants to put on her lot and 2) if the Trial Court erred as to the first issue, whether the Trial Court should be directed to enjoin Price from placing the modular structure or any other temporary residential structure on her lot and to set aside the $5,000 injunction bond awarded to Price.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). Regarding how we are to construe restrictive covenants, the Tennessee Supreme Court has stated:

> [B]ecause such restrictive covenants are in derogation of the right to free use and enjoyment of property, Tennessee courts construe them strictly. *Hughes* [*v. New Life Dev. Corp.*], 387 S.W.3d [453] at 481 [(Tenn. 2012)] (citing *Williams v. Fox*, 219 S.W.3d 319, 324 (Tenn. 2007); *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d 923, 927 (Tenn. 1979)). Thus, "if the right to enforce the covenant as to other property is doubtful such right will be denied." *Shea v. Sargent*, 499 S.W.2d 871, 874 (Tenn. 1973) (quoting *S. Advert. Co. v. Sherman*, 43 Tenn.App. 323, 308 S.W.2d 491, 493 (1957)). Similarly, we have stated that any doubt concerning the applicability of a restrictive covenant will be resolved against the restriction and in favor of the property's unrestricted use. *Hughes*, 387 S.W.3d at 481 (citing *Massey* [*v. R.W. Graf, Inc.*], 277 S.W.3d [902] at 908 [(Tenn. Ct. App. 2008)]); *Parks v.*

*Richardson*, 567 S.W.2d 465, 467-68 (Tenn. Ct. App. 1977)).  Likewise, when the terms of a restrictive covenant can be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner that advances the unrestricted use of the property.  *Id.*  (citing *Williams*, 219 S.W.3d at 324).

*Phillips v. Hatfield*, 624 S.W.3d 464, 475 (Tenn. 2021).

In *Williams v. Fox*, the Tennessee Supreme Court reversed the Court of Appeals and the trial court's holding that language in a subdivision's restrictive covenants against temporary buildings like trailers and mobile homes applied to modular homes, stating: "We reverse, holding that 'modular homes' are distinct types of structures from 'mobile homes' and 'trailers' and because the restrictive covenant did not expressly prohibit 'modular homes,' the courts cannot expand the plain wording of the covenant to include the defendant's modular home."  219 S.W.3d 319, 321 (Tenn. 2007).  The Tennessee Supreme Court explained:

> Unlike a mobile home or house trailer, a modular home is not built on a permanent chassis, and for that reason, it is not able to be readily moved to another location once installed or erected.  Moreover, while mobile homes are titled as vehicles, modular homes are not.  Once delivered and erected on the property, they become part of the property as a permanent improvement to the real estate similar to a "site-built" home.

> The Oma Lee Williams subdivision's restrictive covenant does not define what is meant by "mobile home" or "trailer."  However, the covenant was recorded on January 11, 1995, well after modular homes were specifically defined and regulated by statute as something distinct from mobile homes and trailers.  Additionally, at the time the covenant was recorded, the difference between mobile homes and modular homes was already being recognized and addressed in restrictive covenants for nearby subdivisions.  The following are excerpts from the recorded restrictive covenants containing reference to modular homes, along with their date of record: "No roundettes, modular or mobile homes shall be permitted on the Property." (Nov. 4, 1993); "No mobile homes, doublewides, trailers, modular homes, shacks or tents shall be used as either temporary or permanent residential or non-residential structures on any lot or parcel." (Nov. 5, 1993); "Mobile homes, modular or pre-fabricated homes shall not be permitted." (Nov. 8, 1993); "All trailers, mobile homes and/or modular homes are expressly prohibited." (April 13, 1994); "Mobile homes and/or modular homes are expressly prohibited . . . ." (Oct. 31, 1994); "All trailers, motor

homes, mobile homes, and/or modular homes are expressly prohibited."
(Nov. 21 1994). Unlike the language of these restrictive covenants, however,
the Oma Lee Williams subdivision's restrictive covenant does not
specifically refer to or make mention of modular homes.

\*\*\*

[P]ast cases have tended to broadly construe restrictions against "trailers"
and "mobile homes" on the basis that such a broad construction was
consistent "with the desire of developers to prevent property owners from
placing residential units that were constructed off-site onto subdivision lots."
*Hicks v. Cox*, 978 S.W.2d 544, 548 (Tenn. Ct. App. 1998). However, the
present case is the first case to involve a modular home. The prior cases,
including the *Apollo Shores* [*Cmty. & Maint., Inc. v. Lynn*, No. E-1999-
00946-COA-R3-CV, 2000 WL 796126 (Tenn. Ct. App. June 21, 2000)] case
which was relied on by the trial court, all dealt with mobile homes built on
permanent chassis and titled and registered pursuant to the Motor Vehicle
Title and Registration Law. *See Hicks*, 978 S.W.2d at 546-47; *Beacon Hills
[Homeowners Ass'n, Inc. v. Palmer Props., Inc.*], 911 S.W.2d [736] at 738
[(Tenn. Ct. App. 1995)]; *Albert v. Orwige*, 731 S.W.2d 63, 64 (Tenn. Ct.
App. 1987); *Apollo Shores*, 2000 WL 796126, at \*3.

*Williams*, 219 S.W.3d at 323-24.

After reviewing certain cases pertaining to restrictive covenants against temporary
structures, the *Williams* Court concluded:

In all the aforementioned cases, the restrictive covenants were
recorded prior to the Tennessee Modular Building Act of 1985, which
specifically defined modular homes as something very different and distinct
from trailers or mobile homes. Had the developers of the Oma Lee Williams
subdivision wished to prohibit modular homes in addition to mobile homes
and trailers, such language should have been included. Because modular
homes are defined by statute as different structures and because they have
been recognized as different structures in other surrounding subdivisions at
the time in question, we cannot expand the restrictive covenant to prohibit
that which it does not explicitly state is prohibited.

*Williams*, 219 S.W.3d at 326. A "modular building unit" is defined by statute as follows:

"Modular building unit" means a structural unit, or preassembled component

-12-

unit, including the necessary electrical, plumbing, heating, ventilating and other service systems, manufactured off-site and transported to the point of use for installation or erection, with or without other specified components, as a finished building. "Modular building unit" does not apply to temporary structures used exclusively for construction purposes, nonresidential farm buildings, or ready-removables that are not modular structures[.]

Tenn. Code Ann. § 68-126-303(8) (2013).

McKeehan argues that *Williams* is not controlling because it dealt with a restriction recorded *after* the 1985 enactment of the Tennessee Modular Building Act; the restrictions of the present case were recorded in 1959. McKeehan argues further that *Williams* did not overrule a long line of Tennessee cases broadly interpreting restrictive covenants against temporary structures. McKeehan cites among other cases the 2016 case of *Napier v. Howard* from the Tennessee Court of Appeals, in which we concluded:

> The Supreme Court has yet to hold against a broad construction of the terms "mobile home" and "trailer." On the contrary, in *Williams v. Fox*, the High Court openly acknowledged how the Court of Appeals had deviated from the general principle that restrictive covenants are to be strictly construed when analyzing restrictions on "mobile homes" and "trailers." 219 S.W.3d at 324. In its opinion, the Supreme Court discussed the cases we have previously mentioned and did not overturn a single one of our holdings, which were all predicated on a broad interpretation of "mobile home" and "trailer."

> ***

> The Supreme Court has subsequently reinforced the view of mobile homes and trailers as short-term and transportable residences by saying, "[t]he very nature of a . . . trailer park containing house trailers and mobile homes give[s] rise to the assumption of transient occupancy[.]" *Smith Cnty. Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC*, 304 S.W.3d 302, 315 (Tenn. 2010). Moreover, mobile homes and trailers are both built on permanent chassis, thus making them easily capable of being transported elsewhere. *Williams*, 219 S.W.3d at 323. When taking all of these facts into account, it appears to us that a restrictive covenant barring "single wide mobile homes" would evidence a clear intent to prohibit temporary housing from occupying lots in the subdivision. In our view, such a prohibition would naturally include the "camper trailers" at issue in this case, a conclusion further supported by the fact that Howard rents out her camper trailer sites

-13-

on a month-to-month basis. Accordingly, we conclude the trial court was correct in holding that the restrictive covenant against "single wide mobile homes" would extend to "camper trailers."

*Napier v. Howard*, 516 S.W.3d 477, 482 (Tenn. Ct. App. 2016).

In response, Price argues that *Williams* is conclusive authority; that the *Williams* Court clearly distinguished modular homes from mobile homes or other such temporary structures; and that the *Williams* Court did not limit its holding to covenants and restrictions adopted after enactment of the Tennessee Modular Building Act. According to Price, the Fort Loudon Estates covenants and restrictions do not prohibit her modular home.

To recap, the restriction at issue, Item Four of the Fort Loudon Estates covenants and restrictions, provides: "4. Temporary Structures: No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding shall be used on any lot at any time as a residence either temporarily or permanently." In her brief, McKeehan states that "[t]he covenant's language shows an express intent to prohibit 'temporary structures', including 'trailers.'" McKeehan points out that Price's modular home has many of the same features of a mobile home or trailer, which she contends would plainly be barred by the restriction. McKeehan argues further that Fort Loudon Estates' covenants and restrictions did not need to specifically include the term "modular home" as the term was not defined for another 26 years after the subdivision's covenants and restrictions were recorded. We agree with McKeehan that the precise term for a structure need not necessarily be spelled out to fall under a restriction against temporary structures. The term "modular home" may not have occurred to the drafters of the covenants and restrictions in 1959. Nevertheless, while we are to give effect to restrictive covenants, we are not to expand them. The dispositive issue is whether Price's modular home is, in fact, a temporary structure prohibited by the restrictions of Fort Loudon Estates. The Trial Court found it is not.

With respect to whether Price's modular home is a temporary structure, the Trial Court had the benefit of Buhl's testimony, among other evidence. Buhl testified, to wit: that while he personally could not state whether it complies with the Tennessee Modular Building Act of 1985, Price's home is a "regulated and constructed" modular home rather than a mobile home; that a modular home is designed to be permanently affixed to a foundation; and that a modular home is not designed to be easily transportable to different sites like a single-wide trailer or mobile home. Buhl acknowledged that Price's home could be moved after it is put into place, although not easily. However, Buhl also testified that, in principle, any house in the subdivision could be moved. In addition, the Trial Court had the benefit of documentary evidence, including the Compliance Certificate and Building Plans, the Data Plate, and the Spec Sheet. As explained by the Tennessee Supreme Court

-14-

in *Williams* and, in keeping with the Tennessee Modular Building Act, Tenn. Code Ann. §§ 68-126-301, *et seq.*, a modular home is not the equivalent of a mobile home or trailer; it is of a more permanent nature. We are not at liberty to ignore this distinction.[2]

The evidence at trial, summarized above, reflects that Price's home is a modular home. It was designed and intended to be permanent. It is not easily movable once affixed. While manufactured off-site, the record reflects nonetheless that Price's modular home is meant to be rooted in one place indefinitely, as would be true for any other home built in the subdivision. It would become, as our Supreme Court in *Williams* described, "part of the property as a permanent improvement to the real estate similar to a 'site-built' home." 219 S.W.3d at 323. Meanwhile, the record is bereft of evidence that Price's modular home was designed or intended to be a temporary structure. There is nothing in the record to indicate that Price's modular home is designed or intended for transient occupancy or ready transportability, characteristics mentioned in *Napier* as associated with mobile homes and/or camper trailers. The fact that Price's home may superficially resemble a mobile home in some ways does not make it one, nor does it make it a temporary structure. If Fort Loudon Estates homeowners wished to prohibit modular homes in their subdivision, they could have amended their covenants and restrictions to do so. However, they did not. The evidence does not preponderate against the Trial Court's finding that Price's modular home is not a temporary structure. We hold, as did the Trial Court, that the Fort Loudon Estates covenants and restrictions do not prohibit Price's modular home. McKeehan's second issue is pretermitted. We affirm the judgment of the Trial Court.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Cathy McKeehan, and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

[2] We recognize that, in theory, a structure could merely be labeled a modular home and not actually fit the definition of one. However, the evidence in the record on appeal reflects that Price's home is a bona fide modular home, and as such, comes under the holding of *Williams*. In her reply brief, McKeehan acknowledges that the home Price wants to buy is a modular home.