IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 13, 2024 Session

## JONATHAN DOUGLAS v. FIVE STAR PROPERTIES, INC.

**Appeal from the Chancery Court for Hamblen County**
**No. 23CV-363      Douglas T. Jenkins, Chancellor**
_____

**No. E2024-00063-COA-R3-CV**
_____

Jonathan Douglas ("Mr. Douglas") filed a Complaint to Enforce Deed Restrictions seeking to enjoin Five Star Properties, Inc. ("Five Star") from building a CrossMod home in a subdivision in which the parties each own property. Mr. Douglas argued that the CrossMod is a "mobile home" and is thus prohibited by the parties' respective deeds. Following a bench trial, the trial court entered judgment in favor of Mr. Douglas. Five Star appeals that judgment. We conclude that the CrossMod home at issue is not a "mobile home," reverse the judgment of the trial court, and vacate the injunction entered by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed;
Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Noah J. Patton, Tazewell, Tennessee; and Thomas Werth Thagard, III, John C. Neiman, Jr., and Nicolas H. Peck, Birmingham, Alabama, for the appellant, Five Star Properties, Inc.

Lauren Armstrong Carroll, Morristown, Tennessee, for the appellee, Jonathan Douglas.

Robert L. Vance, Knoxville, Tennessee, for the amicus curiae, Next Step Network, Inc.

Daniel S. Weber, Birmingham, Alabama, for the amici curiae, Clayton Homes, Inc. and The Manufactured Housing Institute.

# OPINION

Both parties own multiple lots in the Win-Vue subdivision ("Win-Vue") in Hamblen County, Tennessee, and Mr. Douglas resides within Win-Vue. Win-Vue's plat was recorded in 1978. Each of the deeds for the Win-Vue lots references the plat and includes the following deed restriction:

> . . . All homes must meet minimum FHA Standards. All outbuildings must be constructed to meet the Southern Building Code. *No mobile homes are permitted*, and no poultry or swine may be raised or kept.

(Emphasis added). Neither the plat nor the parties' deeds define "mobile homes." On August 26, 2023, Five Star began constructing a CrossMod[1] home in Win-Vue (the "Win-Vue CrossMod").

On September 1, 2023, Mr. Douglas filed a Complaint in the Hamblen County Chancery Court ("trial court") averring that the Win-Vue CrossMod is a mobile home and is thus prohibited by the deed restriction. Mr. Douglas requests that Five Star "be required to immediately remove the mobile home" from Win-Vue and "be enjoined from ever placing a mobile home" in Win-Vue. In support thereof, he avers that Win-Vue "is intended to have nice, constructed homes" and that "mobile homes were specifically excluded from [Win-Vue] and should not be permitted as their presence could cause a decrease in property values." Following a hearing on September 14, 2023,[2] the parties agreed to the entry of a temporary order restraining Five Star "from setting up the" Win-Vue CrossMod and prohibiting Five Star from bringing "any other similar structures" into Win-Vue. On October 3, 2023, Five Star filed an Answer denying that the Win-Vue CrossMod is a "mobile home," that its presence in Win-Vue violates the deed restriction, and that its presence could "cause a decrease in property values."

The case proceeded to a one-day bench trial on October 26, 2023. Mr. Douglas and five other Win-Vue residents testified about their own individual interpretations of the restrictive covenant. However, none of the residents had any firsthand knowledge or other evidence about what the developer of Win-Vue actually intended the restrictive covenant to mean. Five Star presented testimony from a number of expert witnesses. Eric Tompos was tendered as an engineering expert and testified that CrossMod homes are designed and

---

[1] CrossMod is a trademark registered by the Manufactured Housing Institute in 2022. Approximately seventy percent of a CrossMod home, including one hundred percent of the livable space, is constructed in a factory. The factory-constructed portion is transported to the construction site by truck and placed on a permanent foundation by crane. The remaining approximately thirty percent of the home comprises the foundation, roof, garage, porch, and driveway, which are all constructed on-site.

[2] There is no transcript of this hearing in the record.

required to be permanent and not "temporary and movable[.]" Mr. Tompos further opined that it would be "just as hard to move a CrossMod as it is" to move a site-built home. Similarly, Michael Mills was tendered as an expert in "house moving" and opined that the existing site-built homes in Win-Vue "can all be moved." More specifically, James Harrell, an expert in structural engineering, testified:

> Q       Mr. Harrell, what distinguishes a CrossMod foundation from a single wide or double wide foundation?
> A       The primary difference is that the foundation for the CrossMods are required to be a permanent load bearing foundation. A typical manufactured home foundation, it would be an option to have a permanent load bearing foundation. Typically it's not. The CrossMod it is. It is required to be permanent and be load bearing.
> Q       Can you describe some of the distinctions between an ordinary manufactured home put on a permanent foundation and a CrossMod permanent foundation.
> A       One of the things would be the measures taken of the frame that's used in the foundation system of the home. Oftentimes with a typical manufactured home those frames don't fit nicely with the foundation walls. If they build a foundation wall. As I said, it's not common for a manufactured home to have a perimeter foundation wall.
> They have to cut beam pockets and things like that, modify the foundation to fit around the frame. Where the CrossMod chassis system has been -- was developed to be placed on a permanent foundation. perimeter [*sic*] foundation walls, so those field modifications aren't required.
> Q       And in the CrossMod, there's sort of beams, do they call them foundation ready beams; is that right?
> A       They are, yes.
> Q       So a CrossMod is designed to be affixed to a permanent foundation.
> A       It's required to be attached to a permanent foundation with load bearing foundation walls.
> Q       And an ordinary manufactured home is not designed to fit on a permanent foundation.
> A       Not necessarily, no.
> Q       How does removing a CrossMod from its foundation compare with removing a mobile home, or an ordinary manufactured home from its temporary foundation?
> A       A traditional manufactured home would be much easier to move. Oftentimes the isolated masonry piers beneath the home, they're dry stacked. Typically the foundation wall is often just skirting. It's not even structural. So with a CrossMod you have this permanent load bearing

structural foundation wall around the exterior that you'd have to break the connections from the home to that foundation. And then to lift the home you -- to move the home you'd have to move out these permanent mortared masonry piers beneath the home, whereas like I said, on a traditional manufactured home those are just dry stacked. So once the home is lifted, they can just -- they can move those out by hand. So moving a CrossMod would be similar to moving, I imagine, a traditional site built home. Things necessary for that.

Andrew Bryant, Clayton Homes' "business development manager and subject matter expert" over its "CrossMod initiative," testified that the Win-Vue CrossMod was built by Clayton Homes. He explained that CrossMod homes are not titled as motor vehicles but are instead required to be "converted to real property." Specifically, he testified that CrossMods have a certificate of origin until the construction of the CrossMod is completed, at which point an affidavit of affixture is executed and the CrossMod becomes part of the real property.

At the conclusion of the trial, the trial court requested additional post-trial briefing by the parties. These post-trial briefs are not included in the record. On January 9, 2024, the trial court entered a Final Order, finding in relevant part:

> 3.      CrossMod homes, and specifically the one at issue, are constructed in a manufacturing facility in two (2) different parts and then those parts are transported where they are to be placed, set up, and converted after some more construction to a home. CrossMod homes are placed on a masonry foundation, not a stacked brick foundation that double-wides are historically placed on. Once on-site, some of the exterior features, amounting to approximately thirty percent (30%) to fifty percent (50%) of the work on the home are completed on-site.
>
> * * *
>
> 5.      CrossMod homes have documentation very similar to the titling of mobile homes, but not identical.
> 6.      CrossMod homes can be moved once placed on-site, but they are generally regarded as homes once they are placed on a lot for living purposes.
> 7. The CrossMod home at issue herein is an improved and more substantial manufactured home that is also commonly and ordinarily identified as a double-wide mobile home or double-wide.

Based upon these findings of fact, the trial court permanently enjoined Five Star from placing a CrossMod home on any Win-Vue lot that is subject to the deed restriction, concluding:

2. … The developer, by expressly prohibiting "mobile homes," intended to prohibit double-wide mobile homes as well.

\* \* \*

4. The [trial court] finds the developer intended to prohibit homes that are built off-site and then brought to the building site to be set up on lots.

5. The [trial court] finds that a CrossMod home, although greatly improved, it is what the public generally calls a double-wide mobile home.

Five Star now appeals.

## ISSUE

Five Star raises a single issue on appeal: "Whether the [t]rial [c]ourt erred in holding that a 1978 restrictive covenant proscribing 'mobile homes' clearly prohibits the construction of a CrossMod[] home . . . ."

## DISCUSSION

*a.*

Deed restrictions that "limit[] the uses that can be made by an owner or occupier of land" are restrictive covenants. *Phillips v. Hatfield*, 624 S.W.3d 464, 473 (Tenn. 2021) (citing Restatement (Third) of Prop.: Servitudes § 1.3(3) (Am. L. Inst. 2000)). "The interpretation of 'restrictive covenants, like [the interpretation of] other written contracts, is a question of law' that we review de novo." *Pandharipande v. FSD Corp.*, 679 S.W.3d 610, 618 (Tenn. 2023) (quoting *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 480–81 (Tenn. 2012)) (alteration in original). Because this case was tried by the trial court sitting without a jury, we review the trial court's factual findings de novo with a presumption of correctness, unless the preponderance of the evidence is otherwise. *Cross v. City of Memphis*, 20 S.W.3d 642, 644 (Tenn. 2000); *see also* Tenn. R. App. P. 13(d).

*b.*

In the Final Order, the trial court concluded "that the reasoning set out in *Neas v. Kearns*[, No. 03A01-9812-CH-00386, 1999 WL 233413 (Tenn. Ct. App. Apr. 15, 1999)] is extremely persuasive and likewise, [] *Napier v. Howard*[, 516 S.W.3d 477 (Tenn. Ct. App. 2016)]." The trial court also concluded "that neither of these cases were overruled by [] *Williams v. Fox*[, 219 S.W.3d 319 (Tenn. 2007)]." Five Star argues that the trial court erred in applying *Neas* and *Napier* to this case. Specifically, Five Star argues that this Court, in *McKeehan v. Price*, 646 S.W.3d 486 (Tenn. Ct. App. 2022), and the Tennessee Supreme Court, in *Williams*, specifically rejected the trial court's definition of a "mobile

home" as a home that is built off-site. Instead, quoting *McKeehan*, Five Star insists that a "'mobile home' is a structure 'designed or intended for transient occupancy or ready transportability,' not a structure that is 'designed and intended to be permanent.'" Thus, Five Star argues that, like the modular home in *McKeehan*, the Win-Vue CrossMod is not a mobile home.

As the Tennessee Supreme Court has explained:

> Our consideration of these issues is guided by several principles. First, we keep in mind that "[a] property owner's right to own, use, and enjoy private property is a fundamental right." *Phillips*, 624 S.W.3d at 474 (quoting *Hughes*, 387 S.W.3d at 474). Second, because restrictive covenants are "in derogation of the right of free use and enjoyment of property," they are "strictly construed" and should not be extended "to any activity not clearly and expressly prohibited by [their] plain terms." *Williams*[], 219 S.W.3d [at] 324…. "When the terms of a covenant may be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner which advances the unrestricted use of the property." *Hughes*, 387 S.W.3d at 481 (quoting *Williams*, 219 S.W.3d at 324).

*Pandharipande*, 679 S.W.3d at 620. Additionally, "[a] cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)). We look at the plain meaning of the contract's words to determine intent, and when "the contractual language is clear and unambiguous, the literal meaning controls …" *Id*.

Despite the foregoing rules, cases decided prior to 2007 "tended to broadly construe restrictions against 'trailers' and 'mobile homes' on the basis that such a broad construction was consistent 'with the desire of developers to prevent property owners from placing residential units that were constructed off-site onto subdivision lots.'" *Williams*, 219 S.W.3d at 324 (quoting *Hicks v. Cox*, 978 S.W.2d 544, 548 (Tenn. Ct. App. 1998)). *Williams*, however, was "the first case to involve a modular home." *Id*. The restrictive covenant at issue in *Williams* prohibited "temporary building[s] of any kind including mobile homes, tents, or trailers, or the like[.]" *Id*. at 321. Like the Win-Vue CrossMod, the *Williams* home "was fabricated off-site and transported to defendant's property via trucks." *Id*. Despite this, the Supreme Court ultimately held that "'modular homes' are distinct types of structures from 'mobile homes' and 'trailers,' and because the restrictive covenant did not expressly prohibit 'modular homes,' the plain wording of the covenant cannot be expanded to prohibit the defendant's modular home." *Id*. at 326. "The Supreme Court has subsequently reinforced the view of mobile homes and trailers as short-term and

transportable residences by saying, '[t]he very nature of a ... trailer park containing house trailers and mobile homes give[s] rise to the assumption of transient occupancy[.]'" *Napier*, 516 S.W.3d at 482 (quoting *Smith Cnty. Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC*, 304 S.W.3d 302, 315 (Tenn. 2010)) (alterations in original).

This Court has since noted that *Williams* "discussed the cases [this Court] ha[d] previously mentioned and did not overturn a single one of our holdings, which were all predicated on a broad interpretation of 'mobile home' and 'trailer.'" *Napier*, 516 S.W.3d at 482. In *Napier*, this Court also observed that:

> While interpreting restrictive covenants pertaining to the difference between mobile homes and trailers, "past cases have tended to broadly construe restrictions against 'trailers' and 'mobile homes' on the basis that such a broad construction was consistent 'with the desire of developers to prevent property owners from placing residential units that were constructed off-site onto subdivision lots.'" *Williams*, 219 S.W.3d at 324 (quoting *Hicks*, 978 S.W.2d at 548).

*Id*. at 479–80. In this case, it appears that the trial court placed great weight on these observations in *Napier* when concluding that a prohibition against mobile homes is a prohibition against all "homes that are built off-site and then brought to the building site to be set up on lots." Such weight was undue, however, given the context in which these observations were made.

The restrictive covenant at issue in *Napier* prohibited "single wide mobile homes." *Id*. at 478. The defendant in that case "set up sixteen separate camper trailer sites," which she began renting out "on a month-to-month basis." *Id*. In analyzing whether these camper trailer sites were a violation of the restrictive covenant, this Court reviewed a string of cases that involved similar restrictive covenants:

> In *Albert*[ *v. Orwige*, 731 S.W.2d 63 (Tenn. Ct. App. 1987)], [this Court] analyzed a restrictive covenant in a subdivision against "trailers or mobile homes." *Id*. at 64. The defendants in that case had been enjoined from maintaining a "manufactured or factory-built home" on their property after the trial court had concluded that it was actually a mobile home. *Id*. The "manufactured or factory-built home" had been "pulled by a tractor-truck over the public highways" to the defendants' lot where it was assembled on top of a concrete foundation. *Id*. Following installation, the "wheels, axles and tongues," which had enabled over-the-road transportation, were removed. *Id*. Relying upon persuasive authority from a number of other jurisdictions, this Court acknowledged that "the removing of wheels or running gear of a mobile home and placing it on a permanent foundation does

- 7 -

not convert the home into a permanent structure." *Id*. at 67. As a result, we reasoned that the home had "no more of an air of permanency" than a typical mobile home because it was "just as capable of being separated and transported to and reassembled at another lot." *Id*. at 68. *Ultimately, we concluded that the structure still possessed the potential for movement, a characteristic that made it sufficiently temporary in nature to fall under the restriction against "trailers or mobile homes."*

Two years later, the holding in *Albert* was reaffirmed in *Reese v. Edwards*, No. 22, 1989 WL 51519 (Tenn. Ct. App., filed May 18, 1989). In that case, the defendants assembled a manufactured home on a lot they had purchased in a subdivision that had a restrictive covenant against temporary residences. *Id*. at *1. … Though the manufactured home was installed on a concrete foundation, anchored to the ground, and the "wheel assembly with an axle attached to the substructure of the home" had been removed, the trial court still ordered the removal of the home. *On appeal, we relied upon the rationale in* [Albert] *in affirming the trial court.*

In 1995, we expanded on the holding in *Albert* with our opinion in *Beacon Hills Homeowners Association, Inc. v. Palmer Properties, Inc.*, 911 S.W.2d 736 (Tenn. Ct. App. 1995). In that case, the defendant sought to install a manufactured home on a lot in a subdivision subject to the following restrictive covenant: "No structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding shall be used on any lot at any time as a residence either temporarily or permanently." *Id*. at 737. As was the case in both *Albert* and *Reese*, the home was "pulled by a tractor-truck over the public highways," was to be secured to a concrete foundation, and was to have the "wheels, axles and tongues" removed. *Id*. at 738. … [On appeal, this Court] highlighted the fact that the terms "trailer" and "mobile home" had been used interchangeably in the cases and *concluded that the holding in* [Albert] *was still controlling on this issue*. *Id*. [at 739]. As a result, [this Court] affirmed the trial court's determination that the manufactured home qualified as a "trailer" under the restrictive covenant. *Id*.

Three years later, in *Hicks v. Cox*, [this Court] examined whether a single-wide mobile home would qualify as a "trailer" under a restrictive covenant that prohibited trailers in a subdivision …. 978 S.W.2d 544 (Tenn. Ct. App. 1998). … [On appeal, this Court] pointed out the fact that earlier cases had broadly interpreted the terms "mobile home" and "trailer" in a way which was *consistent with developers' intention to prohibit such "temporary" structures in their subdivisions*. *Id*. [at 548]. Thereafter, we reasoned that the word trailer would "include not only a camping trailer, but

also a single-wide mobile home of the variety placed on the defendants' property." *Id*. at 549. …

In 2000, this Court again reviewed a dispute over a restrictive covenant that did not address by name the structure in question in that case. *Apollo Shores Cmty. & Maint., Inc. v. Lynn*, No. E1999-00946-COA-R3-CV, 2000 WL 796126 (Tenn. Ct. App. [] June 21, 2000). Specifically, the restrictive covenant prohibited "[t]he placing of house trailers" on lots in the subdivision. *Id*. at *1. The defendants purchased a "double-wide mobile home" and began installing the unit on their lot. *Id*. The plaintiffs filed a complaint seeking a permanent injunction against the installation of the double-wide mobile home predicated on the subdivision's restrictive covenant. … On appeal, we affirmed the trial court's decision [that the mobile home was prohibited by the restrictive covenant] by noting the interchangeable nature of the terms "mobile home" and "trailer." *Id*. at *4.

… The Supreme Court has subsequently reinforced the view of mobile homes and trailers as *short-term and transportable residences* by saying, "[t]he very nature of a ... trailer park containing house trailers and mobile homes give[s] rise to the assumption of transient occupancy[.]" *Smith Cnty. Reg'l Planning Comm'n v. Hiwassee Vill. Mobile Home Park, LLC*, 304 S.W.3d 302, 315 (Tenn. 2010). Moreover, mobile homes and trailers are both built on permanent chassis, thus making them *easily capable of being transported elsewhere. Williams*, 219 S.W.3d at 323.

*Napier*, 516 S.W.3d at 480–82 (emphasis added).  Notably, each of these cases focused not on whether the home was constructed off-site, but instead on the temporary nature of the home – in other words, whether the home was easily capable of being transported elsewhere once it was placed on-site.  This is reinforced by this Court's ultimate conclusion in *Napier* that "a restrictive covenant barring 'single wide mobile homes' would evidence a clear intent to prohibit *temporary housing*[.]"  *Id*. at 482 (emphasis added).  Consequently, in this case, the trial court's conclusion that the restrictive covenant prohibiting mobile homes is "intended to prohibit homes that are built off-site and then brought to the building site to be set up on lots" is in error.

We instead look to this Court's more recent opinion in *McKeehan* for guidance.  The restrictive covenant at issue in *McKeehan* prohibited any "structure of a temporary character, trailer, basement, tent, shack, garage, barn or other outbuilding[.]"  *McKeehan*, 646 S.W.3d at 487.  The defendant in that case intended to construct a modular home on her lot.  *Id*.  The modular home would be manufactured in a facility, transported to the lot "in two pieces using a tractor and an escort[,]" and then "assembled on-site."  *Id*. at 488.  When asked about whether the modular home had a chassis, the salesperson who sold the

modular home to the defendant testified that it had a "wood frame" that could be left on or removed before the modular home was assembled. *Id*. He further testified that the defendant's modular home was intended to remain on its frame but would be placed on a permanent foundation. *Id.* Ultimately, this Court held:

> The evidence at trial, summarized above, reflects that [the defendant]'s home is a modular home. It was designed and intended to be permanent. It is not easily movable once affixed. While manufactured off-site, the record reflects nonetheless that [the defendant]'s modular home is meant to be rooted in one place indefinitely, as would be true for any other home built in the subdivision. It would become, as our Supreme Court in *Williams* described, "part of the property as a permanent improvement to the real estate similar to a 'site-built' home." 219 S.W.3d at 323. Meanwhile, the record is bereft of evidence that [the defendant]'s modular home was designed or intended to be a temporary structure. There is nothing in the record to indicate that [the defendant]'s modular home is designed or intended for transient occupancy or ready transportability, characteristics mentioned in *Napier* as associated with mobile homes and/or camper trailers. The fact that [the defendant]'s home may superficially resemble a mobile home in some ways does not make it one, nor does it make it a temporary structure. If [the plaintiff] homeowners wished to prohibit modular homes in their subdivision, they could have amended their covenants and restrictions to do so. However, they did not. The evidence does not preponderate against the [trial court]'s finding that [the defendant]'s modular home is not a temporary structure. We hold, as did the [trial court], that the [] covenants and restrictions do not prohibit [the defendant]'s modular home.

*McKeehan*, 646 S.W.3d at 497. Similarly, in this case, the record shows that the Win-Vue CrossMod was designed and intended to be permanent and is not easily movable once affixed. It would be just as difficult to move as any other home in WinVue and, once completed, will be a part of the property as a permanent improvement to the real estate, just as a site-built home would be. The fact that the livable space in a CrossMod is manufactured off-site does not make it a mobile home. The trial court erred in its ruling that the construction of the Win-Vue CrossMod violates the restrictive covenant. Accordingly, we reverse the trial court's ruling and vacate the injunction entered by the trial court.

## CONCLUSION

The judgment of the Chancery Court for Hamblen County is reversed, the injunction entered by the trial court is vacated, and the case is remanded for further proceedings

consistent with this Opinion.  Costs on appeal are assessed to the appellee, Jonathan Douglas, for which execution may issue if necessary.

 

_____
KRISTI M. DAVIS, JUDGE